UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCIS EGAN EDWARDS,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant. | Case No.  15-cv-02781-JCS<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 21 |

## I.　INTRODUCTION

This case arises from the denial of Plaintiff Francis Egan Edwards's application for Supplemental Security Income disability benefits by the Commissioner of the Social Security Administration (the "Commissioner").  In 2014, Judge Illston reviewed the Commissioner's 2012 denial of the application, issuing a remand and ordering the presiding Administrative Law Judge (the "ALJ") to address the medical opinion of Edwards's examining psychologist.  *See Edwards v. Colvin*, No. C 13-01348 SI, 2014 WL 1677972 (N.D. Cal. April 28, 2014).  On remand, the ALJ reconsidered the examining psychologist's opinion, and again decided that Edwards was not disabled.  Edwards then filed this action, seeking review of that decision.

The parties have filed cross motions for summary judgment.  Edwards claims in his motion that, after the remand, the ALJ again failed to properly consider the opinion of his examining psychologist.  The Commissioner disagrees, contending that the ALJ properly considered that opinion and determined that Edwards was not disabled.  For the reasons stated below, the Court DENIES Edwards's Motion for Summary Judgment and GRANTS the Commissioner's Cross-Motion for Summary Judgment.[1]

---

[1] The parties have consented to the jurisdiction of the undersigned United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.    BACKGROUND

### A.    Facts

In her remand order, Judge Illston discussed Edwards's work history and medical conditions.  *See Edwards*, 2014 WL 1677972 at *1.  There, Judge Illston found that Edwards worked from August 1993 to December 2008, holding the positions of meat clerk, food clerk, salesman, and merchandiser during that period.  *Id.*

Edwards stopped working in December 2008.  *Id.*  He was "diagnosed with morbid obesity, degenerative disc disease, sleep apnea, and depression."  *Id.*  In the ALJ's second decision, she determined that Edwards also suffers from anxiety.  *See* Administrative Record ("AR," dkt. no. 10) at 911.  Edwards has regularly visited doctors at Kaiser Permanente ("KP") to receive treatment for his diagnoses and symptoms.  *See Edwards*, 2014 WL 1677972 at *1.  Edwards was last insured on December 31, 2013, the date that served as the endpoint for Edwards's alleged period of disability.  *See* AR at 911

### 1.  Mental Health Records

On February 2, 2010, Edwards saw Dr. Timothy Pile and discussed his history of depression.  AR at 418.  Dr. Pile concluded that Edwards's depression was "recurrent" and contributed to his inability to work.  *Id.*  Dr. Pile prescribed Citalopram[2] for Edwards and referred him for counseling with Joseph Cutler, a licensed clinical social worker at KP.  *Id.* at 418, 782.

Edwards saw Dr. Pile on June 11, 2010, and described two episodes of experiencing a racing heart, chest tightness, and negative thoughts.  *Id.* at 431.  Both lasted three to four hours.  *Id.*  Edwards explained that he was feeling stress and had experienced similar episodes several years ago.  *Id.*  Dr. Pile diagnosed Edwards with panic disorder.  AR 432.  Dr. Pile noted that Edwards's Citalopram was "probably not helping" him.  *Id.*  Dr. Pile also referred Edwards to the psychiatric department for medication evaluation, noting that his depression was a "vigorous problem."  *Id.*

---

[2] Edwards's doctors refer to Citalopram and Celexa interchangeably throughout the record.  The two names refer to the same drug.  *See In re Celexa and Lexapro Marketing and Sales Practices Litigation*, 751 F. Supp. 2d 277, 283 (D. Mass. 2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

On June 24, 2010, Edwards saw Dr. Zeba Hafeez, another KP physician who provided Edwards with mental health treatment. *Id.* at 341–60. Edwards told Dr. Hafeez that he had been depressed for the past three years, and that he had sought psychiatric treatment for his depression in 1992. *Id.* at 341–42. He reported that "his current stressors are mainly due to his multiple medical problems For [sic] which he is applying for SSDI" and "his mother who has dementia and has been living with them for the past 10 years." *Id.* at 341. Edwards also discussed his history of alcoholism and his past drug use, explaining that he attended a chemical dependency program in 1992 and was in a rehabilitation facility for twenty-eight days about ten years prior to that day. *Id.* at 341–42. Dr. Hafeez noted that Edwards had a depressed mood, but a "pleasant and cooperative" demeanor, with an intact recent and remote" memory. *Id.* at 343. He was also "fully oriented" to person, place, time, and situation. *Id.* She assigned him a Global Assessment of Functioning ("GAF") score of 51 to 60, which indicated that he had moderate symptoms. *Id.* at 344. She continued his Citalopram prescription and added Buproprion for his anxiety. *Id.* at 344. She also noted that Edwards was currently undergoing individual therapy. *Id.*

Edwards saw Cutler on July 1, 2010, and reported that his occupational problems, financial problems, ongoing medical issues, and caring for his elderly mother were contributing to his depression. *Id.* at 782–83. Edwards rated the impact of his depression on his functioning as "[s]omewhat [d]ifficult." *Id.* at 783. Edwards also discussed his history of alcohol abuse, acknowledging that he had been a binge drinker, and that he drank partly due to his back pain. *Id.* Edwards told Cutler that he would return to Alcoholics Anonymous. *Id.* Cutler determined that Edwards's mental status was normal, but that he also had a dysphoric mood. *Id.* at 784.

On July 15, 2010, Dr. Hafeez increased Edwards's Wellbutrin dosage and added Gabapentin to help with anxiety, insomnia, and pain. *Id.* at 346.

On July 21, 2010, Edwards saw Dr. Pile and informed him that he was feeling better and "[h]is mood has lightened quite a bit." *Id.* at 442. Edwards also said that he had lost weight. *Id.* Dr. Pile's progress notes reflect that Dr. Hafeez had given Edwards prescriptions for Hydroxyzine, Gabapentin, and Wellbutrin; increased his Citalopram dosage; and discontinued a prescription for Trazodone. *Id.* at 346, 442. Overall, Dr. Pile noted that Edwards seemed to have a lighter mood

3

1  under those medications and was "smiling and looking more relaxed" than Dr. Pile had previously
2  observed.  AR 443.

3         On August 24, 2010, Edwards saw Dr. Hafeez and reported that he had lost forty-five
4  pounds and experienced a "mild reduction in anxiety."  *Id.* at 351.  Edwards also said that
5  informed Dr. Hafeez that he had experienced "no significant change in his depression."  *Id.*  Dr.
6  Hafeez discontinued Edwards's prescriptions for Wellbutrin and Gabapentin.  *Id.* at 350–51.  She
7  also prescribed Effexor and Ambien.  *Id.*

8         Edwards saw Dr. Hafeez again on October 12, 2010, and reported "mild improvement in
9  depression" and feeling that "his depression [was] better than before."  *Id.* at 354–55.  He also said
10 that he had recently experienced and wanted help for "angry thoughts about people . . . ."  *Id.* at
11 355.  Dr. Hafeez noted that she was referring Edwards to individual therapy.  *Id.* at 354.  Dr.
12 Hafeez also prescribed Lamotrigine for Edwards's depression and "subjective mood symptoms."
13 *Id.* at 356.

14        When Edwards saw Dr. Hafeez again on December 7, 2010, he reported having violent
15 nightmares, but that he was feeling less anxious on his medication and intended to join anxiety
16 groups.  *Id.* at 358.  He also informed her that he had lost an additional 15 pounds.  *Id.*  Dr. Hafeez
17 prescribed Prazosin for the nightmares and resumed Edwards's prescription for Gabapentin, noting
18 that Edwards had realized that Gabapentin had reduced his physical pain.  *Id.*

19              **2.  Dr. Zipperle's Evaluation**
20        On July 29, 2010, Edwards was evaluated by Dr. Marion-Isabel Zipperle, Ph.D., a clinical
21 psychologist who assessed Edwards's mental health and residual functional capacity.  AR 318–21.
22 *Id.*  Dr. Zipperle noted that Edwards had major depressive disorder, chronic pain disorder with
23 psychological features and general medical condition, alcohol dependence that was in remission,
24 panic disorder with agoraphobia, impulse control disorder, and personality disorder.  *Id.* at 321.
25 Based on those diagnoses, Dr. Zipperle concluded that Edwards had a "poor" prognosis "due to
26 his depression and his problems leaving his house."  *Id.*  She further concluded that it was
27 "doubtful his problems [would] improve in 12 months."  *Id.*  Dr. Zipperle assigned Edwards a
28 GAF score of 54 and determined that Edwards was able to perform simple repetitive tasks, accept

instructions from supervisors, and interact with coworkers and the public. *Id.* She also opined that "his psychiatric issues would make regularly attending a workplace problematic" because those issues would interrupt his workdays and cause him difficulty with stressors at work. *Id.*

### 3. Mental Residual Functional Capacity Assessment

Dr. Dave Sanford, Ph.D., of the Disability Determination Service ("DDS") also evaluated Edwards's mental residual functional capacity using the medical evidence in Edwards's file with the Social Security Administration ("SSA"). AR at 605. From those records, Dr. Sanford concluded that Edwards's understanding and memory were not significantly limited, but he was moderately limited in his ability to understand and remember detailed instructions. *Id.* Dr. Sanford specifically opined that Edwards "would have difficulty with complex instructions, [although] simple instructions would not be significantly limited." *Id.* at 607. Dr. Sanford further concluded that Edwards's ability to sustain concentration and persistence were not significantly limited unless they were required for extended periods. *Id.* at 605. Dr. Sanford noted that Edwards had the "ability to sustain a basic routine and work schedule." *Id.* at 608. Edwards's capacity to interact socially was not significantly limited in general, but Dr. Sanford opined that his ability to interact appropriately with the general public was moderately limited. *Id.* at 606. Dr. Sanford also opined that Edwards "should avoid greater than occasional public contact but is not otherwise found significantly limited in sustaining brief interactions within the environment of simple work." *Id.* at 608. Dr. Sanford further opined that Edwards's ability to adapt was not significantly limited. *Id.* at 606, 608.

### B. Procedural History

#### 1. Prior to Judge Illston's Order

On April 7, 2010, Edwards applied for Supplemental Security Income disability benefits, alleging a disability onset date of December 15, 2008. *See Edwards*, 2014 WL 1677972 at *1. After the Commissioner twice denied the application, it was referred to an ALJ for hearing. *Id.*

The ALJ reviewed Edwards's disability status, issuing a decision in which she applied the five-step disability analysis outlined in 20 C.F.R. § 416.920(a)(4). *Id.* at 2. At step one, the ALJ found that Edwards had not engaged in substantially gainful activity since the alleged disability

onset date.  *Id.*  At step two, the ALJ found that Edwards suffered from morbid obesity, degenerative disc disease, sleep apnea, and depression.  *Id.*  At step three, the ALJ found that Edwards's impairments did not meet or equal the medical severity of an impairment listed in 20 C.F.R. § 416.925.  *Id.*

At step four, the ALJ concluded that, although he was unable to perform past work, Edwards retained the residual functional capacity ("RFC") to perform light work.  *Id.* at 2–3.  The ALJ explained that Edwards could occasionally carry up to twenty pounds and frequently carry up to ten pounds; sit, stand, and walk for about six hours in an eight-hour day; occasionally climb ladders, ropes, and scaffolds; frequently reach overhead bilaterally, balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  *Id.* at 2.  The ALJ noted that Edwards had to alternate sitting and standing as needed.  *Id.*  The ALJ further noted that Edwards was "limited to one-to-two step simple instruction jobs and occasional contact with the public."  *Id.*

In reaching her step-four conclusion, the ALJ referenced Dr. Zipperle's opinion regarding Edwards's diagnosis, GAF score, ability to do simple calculations, and intact recent and remote memory.  *Id.* at 2.  However, the ALJ did not address Dr. Zipperle's opinion regarding how Edwards's mental health issues would affect his ability to regularly attend work.  *Id.*

The ALJ also determined that Edwards's testimony was "not fully credible" regarding the intensity, persistence, and limiting effects of his symptoms and impairments.  *Id.* at 3.  The ALJ based her determination on the following reasons: (1) the treating physician's notes indicated that he had initiated treatment with the intention of receiving disability benefits; (2) the imaging of his spine showed only "mild degenerative changes"; and (3) his health had improved despite his failure to follow the treatment plans recommended by his doctors, who had instructed him to attend a pain management program, participate in physical therapy, and use the CPAP ;machine for his sleep apnea.  *Id.*

At step five, the ALJ determined that Edwards could perform work in a significant number of jobs existing in the national economy due to his age, education, work experience, and RFC.  *Id.* at 5.  The ALJ relied in part on the vocational expert's opinion that Edwards had the RFC to work as a cleaner.  *Id.*  In her remand order, Judge Illston noted that Edwards's attorney had asked

United States District Court
Northern District of California

the vocational expert whether there was any work available in the national economy for an individual who had Edwards's limitations and also struggled to attend work regularly. *Id.* The vocational expert responded that there were no such jobs. *Id.* This testimony did not alter the ALJ's determination that Edwards was not disabled.

Edwards requested review of the ALJ's decision by the SSA. *Id.* at 1. After his requests were denied, he filed an action for judicial review. *Id.*

### 2. Judge Illston's Order

Edwards made two arguments in his 2013 civil action. *Id.* at 4. First, he argued that the ALJ had improperly rejected the medical opinion of his examining psychologist, Dr. Zipperle. *Id.* at 4. Second, he argued that the ALJ had improperly discredited Edwards's testimony regarding his RFC. *Id.* at 4–7.

Agreeing with Edwards's first argument, Judge Illston found that the ALJ was required to explain or provide a reason for rejecting parts of Dr. Zipperle's opinion. *Id.* at 7–8. Judge Illston noted that the Commissioner must provide clear and convincing reasons for rejecting an uncontradicted opinion from an examining physician. *Id.* (citing *Lester v. Chater* 81 F.3d 821, 830 (9th Cir. 1995)). Judge Illston explained that Dr. Zipperle's opinion was not controverted in the record and that the ALJ had otherwise failed to consider the effect that Edwards's psychiatric issues would have on his workplace attendance. *Id.* at 8. Judge Illston concluded that the ALJ's failure to explain or provide a reason for rejecting Dr. Zipperle's testimony constituted reversible legal error that required a remand for the ALJ to "specifically address Dr. Zipperle's evaluation, as well as the other medical evidence, and explain the weight she gives to this evidence, as well as any reasons for discounting significant probative evidence." *Id.* at 5.

Judge Illston then rejected Edwards's second argument, finding that the ALJ had properly determined that Edwards was not credible under the proper two-step analysis. *Id.* at 9 (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). Judge Illston noted particular findings that supported the ALJ's determination, namely: (1) the inconsistencies between Edwards's testimony regarding his back injuries and the medical findings contained in the record; (2) the conservative treatment plans that doctors had

7

designed for him; and (3) his failure to follow those treatment plans. *Id.* at 9–10.

### 3.  The Second Administrative Hearing

After the remand, the ALJ convened a hearing on December 3, 2014, at which Edwards and vocational expert James Graham testified. *See* AR at 932–70.

During Edwards's testimony, the ALJ asked why he had stopped working in December 2008. *Id.* at 939.  Edwards identified pain as "the main [reason]." *Id.*  Edwards also testified that he took several medications, some of which made him sick, and he had a pituitary tumor that was causing problems with those medications. *Id.*

The ALJ inquired about the onset of Edwards's pain with respect to his back, shoulder, and knee. *Id.* at 939–40.  Edwards testified that he was experiencing lower back pain when he stopped working in 2008. *Id.* at 940–41.  He said that his back pain had since worsened, becoming a constant pain that occasionally radiated into his right leg. *Id.* at 940–41.  Edwards attested that his shoulder pain started on his left side, expanded to both shoulders, and caused him daily, sharp pain depending on how he moved. *Id.*  Edwards said that his knee pain began in 2010 or 2011. *Id.* at 942.  Edwards explained that he had received cortisone shots for his knee and shoulder pain, but a surgery to reduce his arm pain had been unsuccessful. *Id.* at 942–43.

The ALJ next asked Edwards about his several medications. *Id.* at 944.  Edwards testified that he had been using Percocet for three years, but no longer thought that it was easing his pain. *Id.* at 944–45.  Edwards said that he used Lorazepam for his two sleep apnea conditions, and expressed fear of "going to sleep and never waking up." *Id.* at 945.  Addressing his other eight or nine medications, Edwards explained that a "lot of them are for mental issues" and that he took separate medications for blood pressure and his pituitary tumor. *Id.* at 946.

Turning to Edwards's mental health, the ALJ asked Edwards several questions about his depression. *Id.* at 948.  Edwards estimated that his depression began after he stopped working. *Id.*  He started seeing his psychiatrist, Dr. Hafeez, every three months. *Id.* at 953.  Dr. Hafeez had prescribed and, over time, "mostly increased" his psychiatric medications. *Id.*  Edwards explained that he had improved after starting that medication, which helped him feel more balanced. *Id.* at 948.  However, Edwards's depression and stress also caused him to have crying episodes "every

United States District Court
Northern District of California

1    few weeks," difficulty sleeping, loss of approximately fifty pounds. *Id.* at 948–49. Edwards

2    testified that he had "very low" energy levels, and that it was "painful to do things . . . [because]

3    you need energy to engage in life." *Id.* at 949–50.

4            The ALJ then asked Edwards questions about his level of functioning. *Id.* at 954.

5    Edwards testified that he had difficulty sitting for a long period of time due to pain. *Id.* at 954–55.

6    He could not stand to cook a full meal. *Id.* at 955. He was capable of walking "maybe three

7    houses" with the assistance of a cane. *Id.* He could lift five pounds. *Id.* at 957. Because of

8    neuropathy in his hands and feet, which began in 2009, pain prevented him from squeezing his

9    hands or making a fist and his feet felt "really numb, . . . like pins." *Id.* at 956.

10           The ALJ then yielded to Edwards's counsel, who asked how long Edwards was able "to

11   persist" in an activity before experiencing "difficulty." *Id.* at 959, 961. Edwards testified that it

12   varied, but he could persist in an activity for ten to fifteen minutes before needing to "sit . . . or lay

13   [*sic*] down and try to stretch." *Id.* at 961. Then, he would need to rest until his pain subsided,

14   which could take from five to thirty minutes. *Id.* Edwards also explained that he needed to

15   elevate his legs during the day by using a chair, ottoman, or his adjustable bed. *Id.* at 962.

16           When vocational expert Graham testified, he assessed Edwards's past work and explained

17   that work as a retail stock clerk is classified as heavy work with a specific vocational preparation

18   ("SVP") score of 4. *Id.* at 963–64. He further explained that work as a sales representative is

19   classified as medium work with an SVP of 5. *Id.* at 964. These positions, he opined, also had "no

20   transferable skills to sedentary" work. *Id.* Graham also testified that a person with Edwards's age,

21   education, work experience, and limitations would not be able to perform Edwards's past jobs, but

22   would be able to work in light, unskilled jobs such as basket filler, bakery worker, or collator

23   operator. *Id.* at 964-65.

24           The ALJ then asked Graham, "assuming that [she found] claimant's testimony credible,"

25   what jobs would be available to a person with the additional restriction of needing to lie down for

26   five or six hours during the work day. *Id.* at 965–66. Graham testified that "there are no jobs" for

27   such a person. *Id.* at 966.

28           Edwards's counsel also asked Graham to assume the additional limitation of needing to

9

1    take a five to thirty minute break after fifteen to twenty minutes of work activity.  *Id.* at 966–67.

2    Graham testified that there were no jobs for such a person.  *Id.* at 967.

3        **C.    Legal Background**

4            **1.    Five-Step Analysis for Determining Disability**

5        Disability insurance benefits are available under the Social Security Act when an eligible

6    claimant is unable "to engage in any substantial gainful activity by reason of any medically

7    determinable physical or mental impairment . . . which has lasted or can be expected to last for a

8    continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

9    § 423(a)(1).  The Commissioner has established a sequential, five-part evaluation process to

10   determine whether a claimant is disabled under the Social Security Act.  *See Tackett v. Apfel*,

11   180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden

12   of proof for steps one through four, but the burden shifts to the Commissioner at step five.  *Id.*  "If

13   a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need

14   to consider subsequent steps."  *Id.*

15       At step one, the Commissioner considers whether the claimant is presently engaged in

16   "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If he is, the Commissioner finds that

17   the claimant is not disabled.  *Id.*  If the claimant is not engaged in substantial gainful activity, the

18   Commissioner proceeds to the next step.

19       At step two, the Commissioner considers whether the claimant has "a severe medically

20   determinable physical or mental impairment," or combination of such impairments, which meets

21   the twelve-month duration requirement in 20 C.F.R. § 404.1509.  20 C.F.R. § 404.1520(a)(4)(ii).

22   An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do

23   basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe

24   impairment, disability benefits are denied at this step.  20 C.F.R. § 404.1520(a)(4)(ii).  If it is

25   determined that one or more impairments are severe, the Commissioner proceeds to the next step.

26       At step three, the Commissioner compares the medical severity of the claimant's

27   impairments to a list of impairments that the Commissioner has determined to be disabling.

28   20 C.F.R. § 404.1520(a)(4)(iii).  If one or a combination of the claimant's impairments meets or

United States District Court
Northern District of California

equals a listed impairment, the claimant is disabled.  *Id.*  Otherwise, the Commissioner proceeds to the next step.

At step four, the Commissioner considers the claimant's RFC in light of his impairments and whether he can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)).  If the claimant can perform past relevant work, he is not disabled.  *Id.*  If the claimant cannot perform past relevant work, the Commissioner proceeds to the final step.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in light of his impairments, age, education, and work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(v).  If the Commissioner meets this burden, the claimant is not disabled and will not receive disability benefits.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled if there are no jobs available in significant numbers in the national economy that the claimant can perform.  *Id.*

### 2. Determining Disability Where There Is Evidence of Mental Impairment

The Commissioner issued 20 C.F.R. § 404.1520a to supplement the five-step evaluation process where, as here, a claimant alleges that one or more mental impairments prevent him from working.  *See* 20 C.F.R. §§ 404.1520a, 416.920a; *see also Maier v. Comm'r of Soc. Sec.*, 154 F.3d 913, 914–15 (9th Cir. 1998) (per curiam); *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011).  These regulations direct an ALJ to evaluate a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(a).  In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors that include, but are not limited to, chronic mental disorders, structured settings, medication, and other treatment.  20 C.F.R. § 404.1520a(b)–(c)(1).  The ALJ then assesses the degree of the claimant's functional limitations based on his impairments.  20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the claimant's limitations and restrictions, it is not an RFC assessment.  *See* SSR 96-8p, 1996 WL 374184.

Rather, it is a component of analyzing the severity of mental impairments at steps two and three of the sequential evaluation process. *Id.* The mental residual functional capacity assessment used at steps four and five requires a more detailed assessment in which the ALJ is required to address the various functions that are contained in the broad categories found in Paragraph B of the adult mental disorders listed in 12.00 of the Listing of Impairments. *Id.* The listings that are relevant to depression and anxiety, the mental impairments found by the ALJ here, are 12.04 and 12.06.

Listing 12.04 provides in pertinent part:

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of . . . :
>
>> 1. Depressive syndrome . . . .
>
> [¶] . . . [¶]
>
> AND
>
> B. Resulting in at least two of the following:
>
>> 1. Marked restriction of activities of daily living; or
>>
>> 2. Marked difficulties in maintaining social functioning; or
>>
>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>
>> 4. Repeated episodes of decompensation, each of extended duration;
>
> OR
>
> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
>> 1. Repeated episodes of decompensation, each of extended duration; or
>>
>> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

United States District Court
Northern District of California

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Listing 12.06, for anxiety-related disorders, provides as follows:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1.  Generalized persistent anxiety. . . .

[¶] . . . [¶]

or

[¶] . . . [¶]

3.  Recurrent severe panic attacks . . . .

[¶] . . . [¶]

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.*

Where the listings refer to a "marked" limitation, "it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or

13

1    even when only one is impaired, as long as the degree of limitation is such as to interfere seriously

2    with [the claimant's] ability to function independently, appropriately, effectively, and on a

3    sustained basis." *Id.* at 12.00C.

4        **D.    The ALJ's Second Order**

5        The ALJ issued her second decision on February 20, 2015.  AR at 906–21.  Concluding

6    that Edwards was not disabled, the ALJ described her application of the five-step analysis and

7    supplemental regulations for assessing mental impairments.  *Id.*

8            **1.   Step One**

9        The ALJ determined that Edwards did not engage in substantial gainful activity from

10   December 15, 2008, the alleged onset date, through December 31, 2013, the date on which he was

11   last insured.  AR at 911.

12           **2.   Step Two**

13       The ALJ determined that Edwards had a combination of impairments that was severe.

14   AR 911–12.  The ALJ found that Edwards had the following severe impairments: morbid obesity,

15   sleep apnea, lumbar spine degenerative disc disease, bilateral shoulder impingement, depression,

16   and anxiety disorder.  *Id.*  The ALJ did not, however, deem severe Edwards's other diagnoses

17   (rosacea, hypertension, diabetes, and pituitary tumor) because she found that the objective medical

18   evidence did not indicate that these impairments had caused significant vocational impairments for

19   twelve consecutive months.  *Id.* at 912.

20           **3.   Step Three**

21       The ALJ determined that Edwards's combination of impairments did not meet or

22   medically equal the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart 4,

23   Appendix 1.  AR at 912.  The ALJ explained that "no treating or examining physician has reported

24   findings, which either meet or are equivalent in severity to the criteria of any listed impairment,

25   nor are such findings indicated or suggested by the medical evidence of record."  *Id.*

26       The ALJ specifically found that Edwards's mental impairments, considered independently

27   and in combination, failed to meet the criteria provided in Appendix 1.  *Id.*  In making that

28   finding, the ALJ reasoned that the record did not include evidence sufficient to satisfy Paragraphs

United States District Court
Northern District of California

B or C of Listing 12.04.  *Id.* at 913.  For Paragraph B, the ALJ found that the record did not support a finding of marked limitations or any episodes of decompensation of extended duration. *Id.*  The ALJ also determined that the record failed to establish the criteria enumerated in Paragraph C.  *Id.*

### 4.  Step Four

Here, the ALJ found that Edwards had the RFC to perform light work, including the capacity to lift and carry twenty pounds occasionally and ten pounds frequently.  AR at 914.  In an eight-hour workday, Edwards could sit, stand, or walk for six hours.  *Id.*  He could occasionally reach overhead bilaterally and climb ladders, ropes, or scaffolds.  *Id.*  He could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  *Id.*  However, he had to avoid concentrated exposure to hazards, and was limited to simple, repetitive tasks and occasional contact with the public.  *Id.*

The ALJ rendered that finding after determining that Edwards's medically determinable physical and mental impairments could reasonably be expected to produce his alleged symptoms. *Id.* at 915.  However, the ALJ found that Edwards's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible because they were "not consistent with the minimal objective findings throughout the record" and "appear[ed] overstated when compared to the objective findings."  *Id.*

The ALJ provided several reasons for her determination that Edwards's testimony was not credible in several respects.  First, the record did not support Edwards's assertion that he was unable to work because he had to sit with his legs elevated for four or five hours a day because there was no evidence of edema or cardiopulmonary issues.  *Id.*  Second, the record did not support the conclusion that Edwards had to receive the regular injections for his pituitary tumor during working hours.  *Id.*  Third, the ALJ discounted the following statements that Edwards made in his RFC report: he spends four to six hours lying down every day; he cannot do any housework; and he needs help from his wife with his personal care.  *Id.* at 915.  The ALJ explained that the "treatment notes of record do not support this level of inability to function."  *Id.*

Likewise, the ALJ found that Edwards's testimony about the severity and limiting effects

1    of his back pain, sleep apnea, and depression were not credible when she compared them to the

2    objective treatment notes in the record.  *Id.* at 915–17.  The ALJ pointed to evidence that Edwards

3    had initiated treatment with the intention of seeking disability benefits.  *Id.* at 915.  The ALJ

4    further cited evidence that Edwards did not comply with treatment guidelines or follow through

5    with treatment options that were helping him improve, specifically noting his failure to attend

6    physical therapy and use devices designed to address his sleep apnea.  *Id.* at 915–17.

7         Turning to specific opinion evidence, the ALJ gave minimal weight to statements by Dr.

8    Pile and the opinion of another doctor regarding Edwards's physical impairments.  *Id.* at 918.  The

9    ALJ explained that the doctors had failed to substantiate their reasons supporting their respective

10   opinions and that those opinions were otherwise unsupported by the record.  *Id.*

11        The ALJ granted great weight to the respective opinions of the DDS consultants.  *Id.*  The

12   DDS medical consultant's opinion was functionally identical to the ALJ's ultimate findings

13   regarding Edwards's residual functional capacity.  *Id.*  The DDS psychological consultant, Dr.

14   Sanford, had opined that Edwards was "limited to one-to-two step simple instruction jobs with

15   occasional contact with the public . . . ."  *Id.*  The ALJ also explained the DDS consultants'

16   opinions were "the most comprehensive and consistent with the longitudinal medical record."

17   *Id.* at 917.

18        Turning to Dr. Zipperle's medical opinion, the ALJ explained as follows:

19
20       The claimant underwent a psychological consultative examination
         with Marion-Isabel Zipperle, Ph.D., on July 29, 2010. The claimant
         alleged that he was "in pain all the time. I'm depressed and have
21       panic attacks." Dr. Zipperle observed the claimant to be depressed
         and have an anxious mood. His immediate, recent, and remote
22       memory were intact. He was able to do simple calculations and spell
         "world" forwards and backwards. Dr. Zipperle diagnosed major
23       depression, chronic pain disorder, panic disorder, and a personality
         disorder. She assigned the claimant a GAF of 54, indicative of
24       moderate symptoms.

25       As discussed above, treatment notes from [KP] generally
         corroborate Dr. Zipperle's findings except as discussed more fully
26       below.

27       As required by the District Court order, the undersigned has
         considered the opinion of the consultant examiner, Dr. Zipperle, and
28       specifically discounts her opinion that the claimant's psychiatric
         issues would make regular attendance at work problematic for the

reasons discussed below.

First, it is noted that the consultative examiner did not have any records to review other than the claimant's disability report and instead relied on his self-reported symptoms. She noted that claimant had never been psychiatrically hospitalized. He presented as depressed and anxious but open, coherent, and logical. His mood and affect were depressed and anxious, and he reported concentration difficulties, but he did well on memory testing, calculations, and concentration. The items listed in the consultative examiner's discussion and prognosis are all from claimant's report. The consultative examiner does not note any difficulties interacting with her, and, in fact, the claimant was able to report his entire childhood and work history with no difficulties noted. The consultative examiner's finding that the claimant would have problems attending work is inconsistent with her finding that he can manage his own money, perform simple, repetitive tasks, interact with others, and would not need special instructions.

The undersigned notes that no treating doctor has indicated that the claimant would have problems attending work. Further, the consultative examiner's opinion is based on a one-time evaluation with no records to review and complete reliance on the claimant's subjective reports. The consultative examiner gave the claimant a GAF of 54, indicating moderate limitations, and consistent with treating provider GAF scores of 51 to 60. Although the claimant has been found to have depressed mood with moderately severe symptoms and diagnosed with major, recurrent depression with a social anxiety disorder, those limitations are reflected in the residual functional capacity. No treating doctor has indicated that claimant would miss work as a result of his depression. In fact, as stated above, his treating doctor at [KP] indicates that he returned to [KP] after a long absence because he "seems to be asking for disability[,"] a conclusion that the consultative examiner failed to address because she did not have the opportunity to review any treating records. Treatment records also indicate limited treatment for depression, an indication that it may not be as severe as alleged by the claimant. Treating records indicate that claimant takes Lorazepam, Trazodone, Venlafaxine [sic] (Effexor), Citalopram, and Lamotrigine for depression and anxiety. However, he has had fairly normal mental status examinations with the exception of being depressed, including being described as being in a good mood at times. He describes severe depression, partly due to being denied disability benefits. However, after medication adjustment, he described his mood as being lightened "quite a bit[."] Despite his depression, he has reported that he is not suicidal.

There is also some evidence of drug-seeking behavior and medication inconsistencies. [KP] doctors have refused to continue prescribing opiate medications in the pain clinic. Claimant's doctor advised him that he was taking too much Tylenol. The claimant's urine toxicology was negative for Oxycodone although it was prescribed. The claimant complained of having to give a urine sample. He has been diagnosed with monitoring opioid therapy, long-term use. His doctor discussed with him concerns regarding medication addiction.

> The claimant has had very conservative mental health treatment. Further, he testified that he saw his psychiatrist only once every three months and that his medications have helped some when adjusted. He has never been psychiatrically hospitalized, and has no treating doctor support that he cannot work. For these reasons, the undersigned affords great weight to the DDS opinion that claimant can do simple, repetitive tasks with occasional public contact.
>
> In sum, the above residual functional capacity assessment is supported by the record as a whole.

*Id.* at 918–19 (citations omitted).

### 5. Step Five

Here, the ALJ found that, from the alleged disability onset date through the date in which Edwards was last insured, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Edwards's could have performed. AR at 919. The ALJ determined that Edwards's capacity to perform the full range of "light work" was impeded by additional limitations as identified in his RFC. *Id.* at 920. Based on the testimony of the vocational expert at Edwards's second hearing, the ALJ determined that Edwards could perform the requirements of representative occupations such as basket filler, collator operator, and bakery worker. *Id.* Finding that he was capable of transitioning to other work existing in significant numbers in the national economy, the ALJ concluded that Edwards was not disabled under the Social Security Act. *Id.*

### E. The Motions

In his summary judgment motion, Edwards asks the Court to reverse the Commissioner's denial of disability benefits, or, in the alternative, remand for further proceedings. Plaintiff's Motion for Summary Judgment ("Pl. Mot.," dkt. no. 16) at 1. Edwards contends that, on remand, the ALJ again committed reversible error by failing to properly consider the medical opinion evidence from his examining psychologist, Dr. Zipperle. *Id.* He specifically argues that the ALJ again "failed to articulate a legally sufficient rationale to reject" Dr. Zipperle's opinion. *Id.* at 2. Edwards further argues that the ALJ erred in giving great weight to the opinion of the nonexamining DDS physician over the examining opinion of Dr. Zipperle. *Id.* at 10. Edwards maintains that the proper remedy is for the Court to remand the case and order the Commissioner

1    to pay benefits on the grounds that further development of the case would be "futile." *Id.* at 11.

2         In her cross motion for summary judgment, the Commissioner contends that the ALJ's

3    decision is supported by substantial evidence and is free of legal error.  Defendant's Cross-Motion

4    for Summary Judgment (dkt. no. 21) at 1.  The Commissioner argues that the record supported the

5    ALJ's finding that Edwards had retained the RFC to perform a range of light work activity and,

6    therefore, Edwards was not disabled.  *Id.* at 2.  The Commissioner further argues that the ALJ's

7    rejection of Dr. Zipperle's medical opinion was sufficiently articulated and supported by

8    substantial evidence, noting that the evidence in the record, including Dr. Zipperle's other

9    findings, did not support Dr. Zipperle's opinion that Edwards's mental health conditions would

10   make regular attendance at a workplace problematic.  *Id.* at 3.  The Commissioner also argues that

11   Dr. Zipperle relied primarily on Edwards's self-reported symptoms, which the ALJ had properly

12   determined were not credible.  *Id.* at 3–4.  The Commissioner likewise argues that the ALJ did not

13   err by giving greater weight to the opinion of Dr. Sanford, the nonexamining DDS consultant,

14   because the conclusion that Edwards remained capable of understanding, remembering, and

15   carrying out simple tasks with no more than occasional public contact was consistent with

16   independent clinical findings.  *Id.* at 4–5.  The Commissioner requests the Court's affirmation of

17   the ALJ's decision, or, alternatively, remand of the case for further proceedings.  *Id.* at 7–8.

18   **III.    ANALYSIS**

19        **A.    Legal Standard Under 42 U.S.C. § 405(g)**

20        When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a

21   denial of benefits only if it is not supported by substantial evidence or if it is based on legal error."

22   *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d

23   1064, 1066 (9th Cir. 1997)); *see also* 42 U.S.C. § 405(g).  Substantial evidence must be based on

24   the record as a whole and is "such relevant evidence as a reasonable mind might accept as

25   adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial

26   evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v.*

27   *Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and*

28   *Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)).  Even if the Commissioner's findings are

United States District Court
Northern District of California

1    supported by substantial evidence, "the decision should be set aside if the proper legal standards

2    were not applied in weighing the evidence and making the decision." *Benitez v. Califano*,

3    573 F.2d 653, 655 (9th Cir. 1978).

4         In reviewing the record, the Court must consider the evidence that supports and the

5    evidence that detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273,

6    1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). "Where

7    evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that

8    must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Courts "are constrained

9    to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the

10   ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S.

11   194, 196 (1947)).

12        If the Court identifies defects in the administrative proceeding or the ALJ's conclusions,

13   the Court may remand for further proceedings or for a calculation of benefits. *See Garrison v.

14   Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

15        **B.    The ALJ Properly Rejected Some of Dr. Zipperle's Medical Opinion**

16        Edwards's sole claim of error is that the ALJ improperly rejected some of Dr. Zipperle's

17   medical opinion. Edwards essentially argues that the ALJ did not comply with Judge Illston's

18   order by failing to provide reasons that meet the "clear and convincing" standard required to

19   properly reject an examining doctor's uncontroverted opinion. *See* Pl. Mot. at 1. The Court

20   disagrees and finds that several reasons provided by the ALJ for rejecting one part of Dr.

21   Zipperle's opinion are clear and convincing.

22        To properly reject an uncontradicted opinion from an examining doctor the ALJ was

23   required to provide "clear and convincing reasons." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

24   1995) (quoting *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990)). Furthermore, where the

25   opinion of an examining doctor is contradicted by another doctor, the examining doctor's opinion

26   can only be rejected for specific and legitimate reasons that are supported by substantial evidence.

27   *Id.* at 830–31 (citing *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995)). The Ninth Circuit

28   has also held that the opinions of treating doctors are entitled to the greatest weight, followed by

United States District Court
Northern District of California

United States District Court
Northern District of California

1    those of examining doctors, and then by those of nonexamining doctors.  *Id.* (citing *Winans v.*

2    *Bowen*, 853 F.2d 643, 647 (9th Cir.1987) and *Pitzer*, 908 F.2d at 506).  Here, three of the ALJ's

3    reasons meet the clear and convincing standard.

4         First, the ALJ reasoned that Dr. Zipperle's opinion regarding Edwards's mental health

5    conditions and the extent to which they limited his ability to regularly attend work was

6    inconsistent with the record as a whole.  AR at 918–19.  She explained that no treating doctor had

7    indicated that Edwards would have problems attending work.  *Id.* at 918.  She further explained

8    that Edwards's doctors had designed a conservative treatment program for him, which is a proper

9    consideration.  *Id.* at 919; *cf. Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (stating that

10   "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding

11   severity of an impairment").

12        Substantial evidence supports this reason and the ALJ's conclusion that the record did not

13   indicate that Edwards possessed mental health limitations that would impair his ability to attend

14   work.  That evidence included the following: Edwards presented himself appropriately at medical

15   appointments and engaged appropriately with medical staff; he performed well on mental status

16   testing; and, without any mental health incident, he attended Alcoholics Anonymous meetings,

17   traveled internationally for one month on at least two occasions, and had performed errands

18   outside the home.  *See* AR at 197–98, 320, 343, 639, 703, 775–76, 784, 826, 904, 1286, 1293,

19   1304; *see also* 20 C.F.R. § 404.1529 (an ALJ may consider the claimant's statements or reports

20   and daily activities in determining how an alleged impairment may affect his ability to work).

21   Furthermore, the GAF scores assigned to him by Dr. Zipperle and Dr. Hafeez indicated that

22   Edwards's symptoms were moderate.  AR at 321, 344.  Lastly, the ALJ reasonably determined

23   that Edwards's mental health treatment was conservative.  *See id.* at 919.  He saw his psychiatrist

24   only once every three months and the medications prescribed for him had helped him, as both he

25   and his treating physician had observed.[3]  *See id.* at 344, 346–47, 354–55, 358, 442–43, 775–76,

26

27   _____

     [3] Edwards's argument that the ALJ should not use the limited nature of his mental health treatment
     against him because mental health issues often go untreated and underreported is unpersuasive.
28   Pl. Mot. at 8–9.  Here, Edwards reported his condition and received treatment for his mental
     health.  Thus, whether others fail to report or receive treatment for their mental health issues is of

                                        21

948, 953–54; *cf. Parra*, 481 F.3d at 750–51.

Second, the ALJ rejected Dr. Zipperle's opinion to the extent that it was internally inconsistent.  Specifically, she reasoned, "The consultative examiner's finding that the claimant would have problems attending work is inconsistent with her finding that he can manage his own money, perform simple, repetitive tasks, interact with others, and would not need special instructions."  AR at 918.  It is the ALJ's responsibility to resolve such internal conflicts and ambiguities in medical testimony.  *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999) (citing *Andrews*, 53 F.3d at 1041; *Magallanes v. Bowen*, 881 F.2d 747, 751, 755 (9th Cir. 1989)).  The Court will not disturb the ALJ's resolution of the inconsistency in Dr. Zipperle's opinion.

Third, the ALJ reasoned that Dr. Zipperle's opinion was unreliable to the extent that she had relied on Edwards's self-reported symptoms.  The Ninth Circuit has explained that "[a]n ALJ may reject a treating physician's opinion if it is based to a large extent on a claimant's self-reports that have been properly discounted as incredible."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (internal quotation marks omitted).  Here, the ALJ found that Dr. Zipperle relied primarily on Edwards's subjective complaints because Dr. Zipperle only reviewed Edwards's disability report, which contained only his subjective complaints.  *See* AR at 318, 918.  The ALJ reached this determination after observing that Dr. Zipperle had no other records to review when she rendered her opinion.  *Id.* at 918.  This interpretation of Dr. Zipperle's report is rational.  The Court is therefore bound by it.  *See Burch*, 400 F.3d at 679.

Furthermore, as Judge Illston found, the ALJ's rejection of Edwards's testimony as not credible is supported by substantial evidence.  *See Edwards*, 2014 WL 1677972 at *5–7; *see also Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (holding that an ALJ must offer "specific, clear and convincing reasons for" rejecting a claimant's testimony about his symptoms).  The ALJ properly noted inconsistencies between Edwards's testimony and the medical findings in the record.  *See* AR at 915.  The ALJ further reasoned that Edwards's failure and unwillingness to

no import.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    follow his doctor's conservative treatment plans constituted evidence that he lacked credibility.[4]

2    *Id.* at 915–16, 919.  The ALJ also cited evidence of drug-seeking behavior and inconsistencies

3    between drugs listed in his urine toxicology report and those that he had been prescribed.  AR 919.

4    In sum, the reasons set forth by the ALJ in making the adverse credibility finding are sufficiently

5    specific for the Court to conclude that the ALJ did not arbitrarily reject Edwards's subjective

6    testimony about the severity of his symptoms.  *See Bunnell*, 947 F.2d at 345–46.  Accordingly, the

7    ALJ did not commit legal error by discounting Dr. Zipperle's opinion to the extent that it was

8    based on Edwards's subjective statements.  *See* AR 918–19; *see also Tommasetti*, 533 F.3d

9    at 1041.

10       Arguing that the ALJ failed to set forth a clear and convincing reason for rejecting Dr.

11   Zipperle's opinion, Edwards cites *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1199

12   to 1200 (9th Cir. 2008).  Pl. Mot. at 9–10.  The court is not persuaded.

13       In *Ryan*, the ALJ rejected an examining physician's opinion that the claimant's mental

14   impairments would make her unable to complete a regular workweek on the grounds that it was

15   based too heavily on the claimant's subjective complaints.  *Ryan*, 528 F.3d at 1199.  The Ninth

16   Circuit found that the ALJ's reason was not a clear and convincing.  *See id.* at 1200.  Here, unlike

17   there, the ALJ made a proper adverse credibility finding regarding Edwards's subjective

18   complaints.  *See* AR at 915–17; *see also Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)

19   (holding that an ALJ may disregard medical opinions when they are based on discredited

20   subjective complaints).

21       The Court likewise rejects Edwards's argument that the ALJ committed legal error by

22   affording great weight to the opinion of the DDS consultant, Dr. Sanford.  Pl. Mot. at 10.  While

23   the opinion of a nonexamining physician cannot alone justify the rejection of the opinion of an

24   examining or treating physician, an ALJ may consider such an opinion in the context of other

25

26   _____

27   [4] *Cf. Parra v. Astrue*, 481 F.3d at 750–51 (indicating that evidence of "conservative treatment" is
     sufficient to discount a claimant's testimony regarding severity of an impairment); *Bunnell v.*
     *Sullivan*, 947 F.2d 341, 346 (9th Cir.1991) (holding that "unexplained, or inadequately explained,
28   failure to seek treatment or follow a prescribed course of treatment" is a relevant factor in
     assessing credibility of subjective testimony) (internal quotation marks omitted).

evidence.  *See Thomas*, 278 F.3d at 957 ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").  Dr. Sanford did not examine Edwards, but did review his entire medical record.  AR 607–08.  Dr. Sanford concluded that Edwards would have difficulty with complex tasks and instructions, but would not have such difficulty with simple tasks and instructions or sustaining a basic routine and work schedule.  *Id.*  Dr. Sanford also opined that Edwards "should avoid greater than occasional public contact but is not otherwise found significantly limited in sustaining brief interactions within the environment of simple work."  *Id.* at 608.

The ALJ did not use Dr. Sanford's opinion to reject that of Dr. Zipperle.  *See* AR at 919.  Rather, the ALJ simply afforded great weight to Dr. Sanford's opinion that Edwards was capable of performing simple, repetitive tasks with occasional public contact.  *See id.*  In this particular respect, Dr. Sanford's opinion and Dr. Zipperle's opinion do not conflict.  *See id.* at 321.

The Court must affirm the Commissioner's decision if it was supported by substantial evidence and the ALJ applied the correct legal standards.  *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  Because the Court finds both, the Court affirms the Commissioner's final decision denying Edwards's application for social security disability benefits.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED.  The Clerk is ordered to close the file.

**IT IS SO ORDERED.**

Dated: September 12, 2016

JOSEPH C. SPERO
Chief Magistrate Judge